And we'll proceed to hear argument in the last case on calendar for argument this morning, which is 26-863 Enray Emma Adams, Emma Adams v. United States District Court for the Central District of California, Real Party and Interest, ACWA 388 Community Association. And we will hear first from Mr. Wulfter. You may proceed. May it please the court, Your Honor. Daniel Wulfter for Petitioner Adams. I'd like to reserve three minutes, please. This is the rare case where mandamus is warranted. When the Supreme Court recognized the psychotherapy communications privilege in Jaffe, it explained that a patient speaks frankly to her therapist like a client to her lawyer, because the conversation is not one lawsuit away from her adversary's hands. Remove that assurance and the honest conversation never happens. The lawyer cannot adequately represent his client. The psychotherapist cannot effectively help her patient to heal. As the D.C. Circuit explained in Koch v. Cox, the reasons Jaffe gave for the existence of these privileges are the same. So the waiver rules must be analogous. In footnote 14 of Jaffe, the court said, like other testimonial privileges, the patient may, of course, waive the protection and then doesn't have an issue of waiver in front of it and says it doesn't tell us anything about waiver. So I understand there is a split of authority on this, but the Supreme Court doesn't seem to point us one way or the other in this. So how do we decide? Well, I think that the right way to decide this, Your Honor, is to look at what the D.C. Circuit said in Koch v. Cox and to look at what the Second Circuit said in Henry Sims, which agrees with Koch v. Cox, the only two to actually engage with Jaffe's anti-balancing rationale from outside the circuit. And what they said there is that a plaintiff weighs only when, quote, consistent with the Supreme Court's analogy in Jaffe, he does the sort of thing that would waive the attorney-client privilege, such as basing his claim upon the psychotherapist's communications with him or, as with the marital privilege, selectively disclosing part of a privileged communication in order to gain an advantage in litigation. That's at 489 F. 3rd 390. As we noted in the reply, Henry Sims quotes this language approvingly. And defined waiver, as I just noted, in the attorney-client context, it's not enough to say, I thought what I was doing was legal. You have to take the further step of saying, I'm not liable because I reasonably relied on my attorney's advice that what I was doing was lawful. The same thing would have to go for the psychotherapy communications privilege. It's not enough to say that defendants made me depressed and made me think about suicide. You have to go further and say something like, the defendants caused me so much mental anguish. When you're claiming a particular type of injury, it seems highly pertinent to analyzing a claim for compensation for that injury to look at the course of treatment for the injury. And yet, you seem to say that this cone of privilege shields any inquiry into that. Not, no, your honor, it doesn't. And I want to talk about what the defendants have here, because this goes to what they actually have. And I think it's important to note that in their presentation, what they complain about is not that they do not have thousands of pages of her medical records documenting her medication, documenting how many treatments she had with various providers and whom and when. What they're complaining about is that they don't have, quote, the best evidence, which to them is the privileged internal deep, dark secrets that Dr. Adams shared with her therapist who was trying to help her heal. That's the existence of the privilege is to protect the best evidence. It would be protected by protective orders and limited disclosure, but it's not protected completely by a privilege when the subject matter related to what's at issue is put in dispute by the person themselves. But the subject Again, I return to the attorney-client privilege analogy for this purpose. You could say the same thing about the attorney-client privilege here. Of course, her communications with her lawyers since 2020, or I guess it was since 2023, would bear on the context here. It could confirm, refute, or contextualize her emotional distress, which she has put in issue. And those communications are obviously relevant, but the privilege exists because she has not asserted that something... Because the conversations with a therapist are designed to treat the very condition for which compensation is sought. And what Jaffe said about that is that the public interest in protecting that from disclosure, even when extremely probative, it is not that the privileges still exist. So that wasn't a fact pattern in which it was a plaintiff seeking compensation for emotional injury. It was someone who may have confessed to the therapist that she was, in fact, guilty. Right. But like the attorney-client privilege, it doesn't matter which party is seeking to protect their communications. The point is, what is it that waives that party's right to protect them from disclosure? And here, what the court said in Henry Sims and what the DC Circuit said in Cox is that it is the affirmative act of the plaintiff to put the substance of the communication itself at issue. And no one here disputes that Dr. Adams has never done that in either of her first two trials. She stipulated to keeping them out of the third trial. I mean, as I understand it from Jaffe, the status of the privilege at the state level is entirely statutory. What do the states do with this issue? I know what you, the parties have said some of this. So what do the states do with this issue? So in fact, I believe that what Jaffe was describing was what the states do with this issue, because in finding the federal common law right. This issue of whether or not asserting a claim for significant emotional distress amounts to a waiver of the privilege with respect to treatment for emotional distress from a therapist. I apologize, Your Honor. I have not scoured the state case law for that answer. I'll follow with a 28-J letter. But what we do know is that the federal courts have looked at this issue, and when looking at the federal common law right, the ones that have actually engaged with Jaffe's reasoning, the two cases I just highlighted, Sims and Cox, they both say that it's the affirmative reliance on the communication itself. And I think it's important to note that what she has given to the other side is nearly 5,000 pages of her medical records, very private stuff going down. They asked for her gynecological records going back to 2014. Tell me about those 5,000 pages. What do they consist of? They're all her medical records. They include her dates of treatment, what she was diagnosed with. Provided by who? By all medical providers, including her psychotherapist, by the way. The only records that the psychotherapist, that privilege was claimed over, were the communications themselves. The 600 documents were the therapist's contemporaneous notes about what it was that they discussed, the very heart of the psychotherapist privilege that Jaffe recognized. They have all of the dates of her psychotherapy treatments. They have the medications she used. Do they have, in addition, what she was being treated for, depression, suicidal ideation? I believe that's correct, Your Honor. What they don't have are the discussions that she and her therapist had. And that's what they're asking for. They're asking for that because it's the best evidence they can think of to try to diminish or defeat her claims on a third And I think it's important to note that... Is there any in-camera submission with respect to the part of the discovery that you are trying to protect, that is the communications themselves between your client and the doctors? We have not had to disclose this. We did have to submit them in camera as part of a September, some of them, as part of a September 12 order from the court when my client was undergoing inpatient treatment. The court ordered her to submit medical records for in-camera review so he could make sure she was telling the truth. He didn't, I think, maybe believe the context of why she was not able to attend a status conference. Submitted records relating to the treatment versus her communications with her psychiatrist? I have to look at that. I don't recall the details of what it was that she submitted to the judge, Your Honor, but I believe he looked at the communications at a minimum with regard to the treatment she was currently receiving by that point. And certainly, the district court didn't review the documents going back 10 years that evidenced these communications? No, no, no, and didn't need to because we gave them to the other side as part of the discovery. We ultimately turned over all of the 5,000 medical, 5,000 documents, or nearly 5,000 documents of her physical medical records, which include what she was being treated for, just not the substance of the communications. And was that developed at trial during cross-examination that you have, in fact, been treated over the course of time for depression and some of these other things like anxiety? Well, so what was the defense in the first and the second trial, and this is part of the toolkit they already had, is they knew about her brother's murder, they knew about the abuse she suffered from her husband, they knew about the prior ADA lawsuit that she had won for facing discrimination from her employer, and they tried to tell the jury that those were the cause of her emotional distress. Now, they want to try to do it even better. So what they've gotten is not only an IME, that was a disaster, as we've described, the court's gone a step further. And remind me, why was the IME a disaster? So defendants hired a medical expert who was also a lawyer who badgered Dr. Adams during the interview and made the court very uncomfortable by suggesting things like he was going to go and find her ex-husband and speak with him after the interview. And it was such a disaster that defendants disclaimed any intent to call him at trial. So they asked for another chance to conduct a different Rule 35 IME. The district court said, no, I'm going to exercise my authority under Rule 706 instead and appoint an independent medical expert from the court. Now, that expert is supposed to do the very thing that Judge Collins was asking about. That expert is supposed to look at her records and opine and ask her questions and opine on his views to contextualize, confirm, refute, or contextualize. But what the defendant is saying is that that's not enough. That independent expert would have access to the communications? No, Your Honor. No, no, no, no expert would. And I also want to make clear... Would be reviewing these 5,000 pages and the other information and also conduct an IME? Yes, and can ask her any questions. And in fact, the first IME that was conducted by defendant's expert tried to ask her such things as how to... And that's where the dividing traumas line comes up and tries to get at what it is that caused her traumas. And I want to make very clear here that when we also reserve the right to rebut an eggshell plaintiff theory or to maybe put on an expert in rebuttal, depending on what their expert said, we have never suggested that either of those either would be relying on any of her psychotherapist communications. And I want to say right now that they would not. Did you want to save three minutes for rebuttal? Yes, please. Thank you, Your Honor. Thank you, counsel. All right, we will hear next from Mr. Abraham. Thank you, Your Honor, and may it please the courts. First, I wish to address some of the factual statements, the matter that was submitted to the court in the argument in the case in chief. Yes, it is true that thousands of pages were submitted, but very much so an analogy might be that when one seeks to know what is inside of a building, they provided an exquisite description of the exterior of the building itself. As the court correctly noted, Jaffe was a case in which it was decided that there should be a psychotherapist privilege. But as also noted by the court in footnote 14, the court said, and even shorter terms, that the privilege can be waived, as can any evidentiary. What exactly is that issue here? Because as I read the district court order, it's not a disclosure of the specific notes of communications. What the court had specifically ordered was that the specific communications be redacted, but otherwise the documents evidencing what the court described as being the categories of conditions that she alleged should be disclosed. And those should be disclosed for use by the expert and also allowed in. The court reserved certainly the question of whether or not it would require the unredacting of that information to the extent it was necessary. Are you seeking that in the district court? Yes, in fact, Your Honor, we would, based upon what will be that is disclosed through the independent experts examination. But that's not here yet at this point because the district court hasn't. But you are seeking that, continuing to press that in the district court. Ultimately, yes, Your Honor, that would be. And that's consistent with the line of cases that talk about Rule 35. As the court is aware, when first the whole question of the contours of this examination and the question that was initially presented to the court was whether a necessary standard would be applied. Well, this ultimately became unsatisfactory because of the varying nature of the claims, the extent of the claims, which then led the court very quickly to have to go more analytically and more in a case by case basis to the question of not the existence of the privilege and whether or not it could be subject to Rule 35, but whether there were particular types of claims that would require consideration of waiver. This becomes important because then in the discussion in which the district court engaged and other courts did as well, the question became what standard should be applied. As the case sits right now, it appears that Judge Blumenfeld took by the effect of his order that middle ground. What's interesting is that in most of the cases where the middle ground was selected and where the more broad application of a waiver was not accepted in every one of those cases, and most interestingly, it was in the Fair v. Rosen case, a case that Judge Blumenfeld himself brought up, that it was noted we don't need to actually consider the distinction between those two categories of treatment because the plaintiff has alleged such extreme emotional distress. The position taken by the plaintiff and now the petitioner with respect to the matter before this court is that there should be no waiver of the privilege. It's not a question of 5,000 pages. It's not a question of content. As the court may observe from Judge Blumenfeld's order, because it dealt with a number of subjects, the plaintiff there had continued to maintain the position that there is no waiver whatsoever. We are not asking the court to decide the question of whether there is no waiver. We think there was a waiver. The question is to what degree that waiver should give effect to what is required to be produced. And there, although the court in Fair v. Rosen and a number of others have rejected the middle ground approach, they say it's too difficult. It doesn't provide enough notice. It, in fact, recognizes the essence of waiver argument that exists in every case where a privilege is implicated. Waiver is, in effect, the voluntary bargain into which a party, a litigant, especially a plaintiff, engages when they decide to put an issue, a matter in issue. Not to borrow too much from the prior case about horses. When somebody falls off a horse, if they break their arm and medical records are sought, it's not complicated. There's going to be an injury. There's a damage to the body, physically manifested, and there may be other components. There may be an emotional component. But courts for hundreds of years have figured out how to evaluate an emotional claim. When a batter is hit by a pitch and now is afraid to step too close to the base, he's made a calculation based upon an emotional reaction to it. Now, were that actually a tort and not just a game of baseball, a court or a jury would be well-equipped to evaluate it because it's the psychological trauma that ordinarily attends every kind of tort. In the psychological area, this is referred to as the garden variety emotional distress claim. This case is not the garden variety emotional distress claim. In fact... So let me ask you about that. Yes, sir. The idea of garden variety versus something beyond garden variety involves a certain level of balancing, which Jaffee seemed to warn against. But to the extent that you have courts who adopt a narrow approach, which consists of requiring the privilege to be waived only when the party places the privileged communications directly at issue, why shouldn't the court follow that view, viewing it as more true to what Jaffee is directing us to do? Well, in fact, it's important to note that Jaffee, as I think was observed, was a case very unusual in its circumstances. So to get into the details just briefly, you had a police officer who was involved in an officer-involved shooting. The person died. An action was brought as a result of it. There was concern because as a part of going through an officer-involved shooting, there was counseling. And within the counseling was the question of whether things were said that would reveal whether or not the act itself was a consequence of intent or of the circumstances. Jaffee was never called upon to address the question of whether the claim could be waived because it was an attempt, so to speak, by the administrative agency, we'll say the state, to intrude upon that privilege, the one that the court, a somewhat don't have those circumstances here. And since then, Jaffee has not been the defining point for deciding the one thing that the court mentions in only a few words in footnote 14. There can be a waiver. It's important then because Jaffee noted it was not, by the implication in that footnote, discussing the question of waiver as it wasn't discussing the contours of waiver in any other case. I realize that some discussion was brought up of attorney-client privilege, presumably one of the most sacred of waivers. But we have two explicit instances where it's definitely waived, advice of counsel and a malpractice action. The question of whether or not... And the problem with Jaffee is, for your side, is that that was the analogy that the court drew. The court looked to the attorney-client privilege and you wouldn't get, the attorney-client privilege is only going to be waived in the two circumstances you described. That is, where you put the counsel at issue, that is, I did this on the advice of counsel, or if it's an action against your attorney. And the reality is that Jaffee is not the problem and certainly that example, the example or the model that uses isn't problematic in this case. And there are a number of reasons for that. Firstly, the attorney-client privilege is a somewhat unusual privilege because if we talk narrowly about the communications between the attorney and the client, we can rarely envision an instance where those communications would be the subject of the litigation, outside of those two examples. An exception might be, for instance, the crime-fraud exception, where they're engaging in discussions about a consequence or an act that will have a consequence on a third party. But we could certainly imagine an example where that might be subject to intrusion. Let's take the example, I'm talking with my attorney, video now, it's on the phone as I'm walking across the street and I walk against a red light and I'm hit in the intersection. Now, the only proof, oddly enough, of my walking against that red light is in that video. And now the question is, well, wait a minute, that was occurring in the course of my communications. Of course, it had nothing to do with the communications. And so in crafting an order, which is what it will always come down to in looking at the balance of waiver, what a court would say, we've looked at it in camera, the communications themselves aren't material, they're privileged, we blot out all the audio, and that frame showing the red light could be offered in evidence. That case-by-case resolved the issue by avoiding the conflict. Here, we go further down the road because, again, we have no outward manifestation of injury. Instead, what we have are only feelings, impressions, and consequences. Dr. Adams claims because she was denied for a time a parking space, she is now literally emotionally crippled. Not just simply crippled emotionally, but suicidal. Any discussions that she has with her psychotherapists are not allowed to be disclosed. So she's walled that off. But the only evidence of that, the only contemporaneous evidence, the only what I'll call true insight into her feelings, her emotional state, the condition, the consequence of this are what she shares. The fact, yes? Let me ask you, as to what you shared, in your view, did Judge Blumenfeld do enough in camera to review what was being ordered, produced, to safeguard the public policy concerns that are set forth in Jaffe? I can, of course, only speak to what he shared with us. He was given a, literally, a document dump. This was a selective portion of the record. As counsel had correctly pointed out- Do you know what it consisted of? The only thing that we know, can know that it consisted of were unredacted versions of what we received, as well as some other documents. When you say what you received, tell me a little bit more. So what we received were documents that essentially indicated the number of, a number of periods of time during which she went to facilities. So what we had were documents, essentially admission tickets and discharge papers. So these would show a beginning date and an end date. They had a significant, in fact, in some instances, staggering periods of gaps, during which time we have absolutely no idea what was going on. Also, as was mentioned- And those were reviewed by Judge Blumenfeld? Not reviewed. So what Judge Blumenfeld was concerned about, and understand the context, this is between Trial 2 and Trial 3, that hasn't happened. And were you the trial lawyer? I was, in fact. I've been counsel since the inception of the litigation. What Judge Blumenfeld was concerned about was the fact that he was attempting to move along the question of pacing for trial, whether or not discovery would be allowed. And the statements were made that Dr. Adams could not participate and could not be present. And he wanted to know the reasons for the absence. At that time, she was in an in-custody residential facility. Again, the contours of the treatment, what treatment she was specifically received, we didn't know. Judge Blumenfeld wanted to satisfy himself that what she was doing justified her being absent or not participating. He asked for that information. That was at the same time that we were receiving documents. Again, that only really described the outside of the building, so to speak. What we don't know, and this was really the issue that was addressed in Fairview Rosen and in the important point. If a plaintiff can say, I am so emotionally injured. No, no, there won't be any physical outward manifestation of it, but so much so that I can no longer work. I have a fear I can no longer go out. I can no longer socialize. Now, the events occurred years ago. Presumably contemporaneous with that, there is some treatment. And in fact, there is some treatment that has been received around this time. She also had a prior claim of emotional distress arising out of her employment. And again, the question becomes one of what is allocated to this? Is this a small component of it? Is it no component of it? But because the only evidence that could possibly be discovered relating to her experience and her conditions is not found in an intake form or an outtake form, but in the communications, we think a middle ground approach where first, if appropriate, the court reviews it in camera and decides how much should be received relative again to the discussion at hand. The discussion at hand, the second part of it is the evidence itself to support or defend against the claim, but the question of the degree of waiver. And there, although a number of courts shied away from wanting to engage in that debate, that's the very sort of analysis with which the magistrates and district judges engage every time they deal with waiver. We think it's appropriate in this case. Thank you. All right. Thank you, counsel. We'll hear rebuttal. So, one question I have, Jaffe puts some weight on in recognizing the privilege on the fact that when the evidence rules were originally proposed, they contained a proposed Rule 504 on a psychotherapist patient privilege. Why shouldn't we recognize then also the exception that is stated in that rule? Because the Rule 504 on this that was originally proposed had an exception. There is no privilege under this rule as to communications relevant to an issue of the mental or emotional condition of the patient in any proceeding in which he relies upon the condition as an element of his claim or defense. And the advisory committee note for that says, by injecting his condition into litigation, the patient must be said to waive the privilege in fairness and to avoid abuses. So, why shouldn't that, since Jaffe said 504 as proposed was a basis for recognizing the privilege, why shouldn't that be informative as to the scope of a waiver of the privilege? Your Honor, I... Seems to apply exactly here. It might, except for that word element, mental or emotional condition as an element of the claim. So... Damage is an element of the claim and this is an element of the claim. It's the emotional damage. You do not have to... Let me back up here for a second and I'll just say that I actually want to address this by addressing something my friend said about Jaffe and in saying that falling off the horse is the same. And I think this answers your question as to why that can't be the case. When you fall off a horse and you break your arm, you're not going to forego seeking medical attention, no matter if you think litigation will ensue. The Supreme Court said that is not the case for the psychotherapist communication privilege, that even the mere disclosure, confidentiality is not enough. The mere disclosure or threat of disclosure is enough to interfere with the Jaffe says it in terms and it says that it's the highest risk when you seek therapy in preparation. Well, potentially, unless the plaintiff puts the communication at issue, right? If she tries to prove her claim by making an element of her damages that she had to seek psychotherapy and get treatment for it, of course, we can't use it as a shield and then protect the substance of those communications from the other side. But she hasn't tried to make her treatment an element of the claim. She has only said that they caused her to feel distress, insomnia, and I also want to point out that it wasn't just her. There are recipient witnesses here. I am running out of time and I just want to make sure I answer any other questions the court has. But I want to note that garden variety and severe emotional stress, they cannot tell you what that line is because to Judge Curiel's point, that is balancing. That line to this judge was apparently two million or less, but the moment she sought two million and one dollar, she is now seeking severe damages. I'm not sure why she didn't have to produce them to support a two million remitted her, but she does to have a third trial. Okay, thank you, Your Honor. Thank you, counsel. The case just argued will be submitted and the court for this session will stand adjourned. All rise. Hear ye, hear ye. All persons having had business with the Honorable United States Court of Appeals for the Ninth Circuit will now depart for this court for this session now stands adjourned.
judges: BYBEE, COLLINS, Curiel